UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

HBA MOTORS, LLC                  Case No. 1:21-cv-624

    Plaintiff,                           Judge Timothy S. Black

vs.

ARMAND BRIGANTE, *et al.*,

    Defendants.

# ORDER
### GRANTING IN PART
### PLAINTIFF'S MOTION
### FOR TEMPORARY RESTRAINING ORDER (Doc. 3)

**NOTICE:**

**This is an Order of the Court that applies to Defendants Armand Brigante, Ismail Shalash, and M.D.D.I. Inc. For the reasons stated below, these Defendants <u>SHALL NOT</u> dispose of, transfer or use Plaintiff HBA Motor's assets in their possession. Specifically, Defendants SHALL NOT transfer, dispose of, or use the $990,815 HBA Motor has allegedly sent to Defendants.**

**The Court additionally orders the Defendants by October 13, 2021 to provide to Plaintiff HBA Motors an accounting of ALL assets under Defendants' control, management, and/or possession, and include the name of the relevant financial institutions, account numbers and account holders, the identity of the account signatories, and current balances.**

**Finally, Defendants SHALL attend a conference of this Court on October 12, 2021 at 3:00 p.m. This is a hearing by telephone. DEFENDANTS SHALL CALL: 1-888-684-8852; Access Code 8411435; Security Code 123456; and wait for the Court to join the conference.**

This civil action is before the Court on Plaintiff's motion for a temporary restraining order ("TRO") (Doc. 3), which was filed on September 28, 2021, and Plaintiff's supplemental briefing on the relief it requests (Doc. 8), filed on October 5, 2020. On October 6, 2021, the Court held a conference by phone regarding the TRO.

## I. BACKGROUND FACTS

The following facts are drawn from the motion for the TRO, including the declaration of Zachary Mixon and its exhibits.

Plaintiff HBA Motors "(HBA")" is a Texas based limited liability corporation that buys and sells luxury cars. (Declaration of Zachary Mixon, Doc. 3-1 at ¶¶2-3). An HBA employee, Zachary Mixon, received a phone call from someone who introduced himself as "Armand Brigante." (*Id.* at ¶4).

Brigante, as the Court will refer to him for now, offered to sell HBA two Mercedes-Benz G-Class SUVs. Over the next few days, Brigante and Mixon engaged in a dialogue regarding the potential sale. (*Id.* at ¶5). As part of this dialogue, Brigante sent Mixon photographs of:

- the cars (*Id.* at PageID# 47-49);
- the cars' Vehicle Identification Numbers ("VINs") (*Id.* at PageID# 51)
- certificates of title for each car (*Id.* at PageID# 55, 57).
- a certificate of incorporation for M.D.D.I, the purported legal entity that owned the cars. (*Id.* at PageID# 53).

Relying on those documents and other representations from Brigante, Plaintiff decided to buy the cars—one for $245,000, the other for $252,000. (*Id.* at ¶8). Brigante

2

provided a bank account in the name of M.D.D.I and Plaintiff wired the full $497,000. (*Id.*).

After receiving the wired money, Brigante called Mixon again, offering another high-end car to HBA—a Mercedes-Benz AMG GT-R. (*Id.* at ¶9). Brigante again said he owned the vehicle and could sell it. (*Id.*). Brigante sent photographs of the AMR-GT and the purported certificate of title. (*Id.*, Exhibits A-8 and A-9 at PageID# 60-63). HBA agreed to buy the AMR-GT for $493,815.00, again relying on Brigante's representations and photographs. Brigante asked Plaintiff to wire the funds to a different account, one in the name of "I. Shalash." (*Id.* at ¶10). HBA refused to do so. (*Id.*). Brigante then said HBA could wire the funds to the same account they had used in the transaction for the G-Class SUVs. HBA wired $493,815.00, the agreed upon purchase price, to the account. (*Id.*).

Brigante provided a Cincinnati address at which HBA could pick up all three cars. (*Id.* at ¶11). On September 20, 2021, HBA's hired transport truck arrived at the address, which appeared to host a vehicle repair shop. (*Id.*). The cars were not on the lot. (*Id.*). Neither was anyone who knew of the cars or of someone named Brigante. (*Id.*). Mixon called Brigante. (*Id.* at ¶12). The line was disconnected. (*Id.*). Mixon sent several emails to Brigante and did not receive a response. (*Id.*).

Plaintiff filed a complaint and the present motion for a TRO against Brigante, alleging that he has aliases of "Ismail Shalash" and "Mustafa Shalash" and against M.D.D.I, Inc. In total, Plaintiff alleges it paid $990,815 to Defendant Brigante or his

3

purported business entity. Therefore, Plaintiff's total out-of-pocket loss is $990,815, plus any applicable interest. (Doc. 3 at 1).

In supplemental briefing, Plaintiff submits evidence that Defendant Ismail Shalash is wanted by the FBI for wire fraud and money laundering. (*See* Wanted Poster, Doc. 8-1). An FBI notice also states that "Armand Brigante" is an alias of Defendant Ismail Shalash. Furthermore, Shalash's Cincinnati-based company M.D.D.I., also a Defendant here, is the same corporate name used to allegedly defraud others. (*Id.*).

At the Court's conference regarding the TRO on 10/6/2021, David Omar—who was once known as Mustafa Shalash—appeared with counsel to say that he had incorporated M.D.D.I. more than 10 years ago but has had nothing to do with it since then and nothing to do with the fraud alleged of Ismail Shalash. Plaintiff, through counsel, agreed that Mr. Omar should not be a Defendant in this case. On the other hand, the parties agreed that Mr. Omar properly accepted service on behalf of M.D.D.I. Inc., which remains a party. No one else associated with Defendants appeared at the conference. Also at the conference, Plaintiff's counsel and counsel for Mr. Omar stated a credible basis for believing Ismail Shalash had left the country and a credible basis for believing Ismail Shalash was aware of the legal proceedings against him.[1]

## II. STANDARD OF REVIEW

"The Sixth Circuit has explained that 'the purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had.'" *Reid v.*

---

[1] A transcript of the October 6, 2021 TRO conference is available from the Court.

*Hood*, No. 1:10 CV 2842, 2011 U.S. Dist. LEXIS 7631, at *2 (N.D. Ohio Jan. 26, 2011) (citing *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996)). "The standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." *Id.* (citing *Motor Vehicle Bd. of Calif. v. Fox*, 434 U.S. 1345, 1347 n.2 (1977)).[2]

An "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In determining whether to grant injunctive relief, this Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits;

---

[2] "A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from the specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the Court in writing the efforts, if any, which have been made to give the notice and the reason supporting the claim that notice should not be required." Fed. R. Civ. P. 65(b). "Reasonable notice" consists of information received within a reasonable time to permit an opportunity to be heard. *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439, (1974). In this case, M.D.D.I. received notice. Plaintiff's counsel certifies in writing that he emailed the information to Ismail Shalash's purported email—the same email "Brigante" had communicated from during the transactions. (Doc. 12). Furthermore, Plaintiff attempted to serve Ismail Shalash at several locations, after speaking to his family members about his whereabouts. (*Id.*). Plaintiff implies notice should not be required because Shalash is likely fleeing. (I*d.*). That said, Plaintiff and Mr. Omar's counsel both credibly stated to this Court that Ismail Shalash has notice of the proceeding. The Court finds Ismail Shalash is effectively on notice of the TRO conference. But even if Ismail Shalash were not on notice, the Court would find Plaintiff's counsel has adequately upheld his Rule 65 duty to provide a written statement of his efforts to serve Defendant and why notice should not be required.

5

(2) whether the moving party will suffer irreparable harm if the injunction is not issued;

(3) whether the issuance of the injunction would cause substantial harm to others; and

(4) whether the public interest would be served by issuing the injunction. *Id.* at 573.

These four considerations are factors to be balanced, not prerequisites that must be met. *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). Nonetheless, a finding that there is no likelihood of success on the merits is usually fatal. *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir.2000),

### III. ANALYSIS

While Plaintiff's complaint asserts eight causes of action, it only seeks a TRO on the basis of three: fraud, a fraudulent transfer under Ohio's Uniform Fraudulent Transfer Act ("UFTA") and imposition of a constructive trust. (Doc. 3).

Taking the last item first, the Court finds it makes little sense to consider a TRO based on a claim for a constructive trust. Under Ohio law, "a constructive trust is a remedy, not a cause of action." *Graham v. City of Lakewood*, 2018-Ohio-1850, ¶ 58, 113 N.E.3d 44, 57. Moreover, a constructive trust is most often a remedy for a fraudulent acquisition of property. (*Id.*). The Court will thus only focus on the claims for fraud and fraudulent transfer.

#### A. Likelihood of Success on the Merits

In Ohio, the elements of fraud are as follows: (1) a representation or, where there is a duty to disclose, concealment of fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the

6

intent of misleading another into relying on it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximate caused by the reliance." *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 539 (6th Cir. 2000).

Mixon's declaration and the attached records provide sufficient, indeed substantial, evidence of the elements of fraud. (Doc. 3-1). Brigante misrepresented that he owned the cars and/or intended to sell them. He continued this misrepresentation by sending photographs purporting to document the vehicles' past and current ownership; their VINs; and their current condition—all of which are material to the transaction in question. He further misled Plaintiff by providing a sham address at which to pick up the cars. Brigante's intent to have Plaintiff rely on these misrepresentations is clearly inferable. HBA's reliance was justifiable, because Brigante provided documents that would allow a reasonable person to conclude Brigante really owned the cars and wanted to engage in a transaction to sell them. The resulting injury is evidenced by the wire-transfer records. Accordingly, Plaintiff's likelihood of success on the merits of its fraud claims is well-established and substantial.

Plaintiff's likelihood of success on the merits of the fraudulent <u>transfer</u> claim is more fraught. In large part, Plaintiff argues the fraudulent transfer along the same lines as the fraud. (Doc. 3 at PageID# 9). For the reasons already stated, the Court agrees that Plaintiff has shown "badges" of fraud regarding the transaction at-large. (*Id.*). The closer question is whether they have also put forward evidence of a fraudulent <u>transfer</u>.

If Brigante merely "received" the funds without removing them from the M.D.D.I account, he has arguably completed his fraud but not yet engaged in a fraudulent transfer.

7

As Plaintiff admits, Plaintiff is a creditor once Plaintiff's tort action accrues. (*Id.* at PageID# 33). Thus, Plaintiff does not have a fraudulent transfer claims unless it can show Defendants transferred the funds to a third location <u>after</u> Plaintiff had sent them to M.D.D.I.

That leaves the question of whether Brigante or M.D.D.I. *subsequently* transferred the funds to avoid a claim by Plaintiff. The Court discerns only a single piece of evidence of this. Mixon declares: "I have been informed by other employees of HBA that HBA asked its bank to reverse the wire transfer, but that the bank was unable to do so because it appeared the funds had already been withdrawn from the account that received the wire transfer." (Doc. 3-1 at PageID# 44). With this as the only evidence of a subsequent transfer by Defendants, the Court cannot conclude that Plaintiff has not (yet) demonstrated a substantial likelihood of success on the merits of its fraudulent transfer claim.

Nonetheless, the Court is convinced that Plaintiff has demonstrated a likelihood to success on the merits of its common-law fraud claim and will consider an appropriate TRO.

### B. Irreparable Harm

"To demonstrate irreparable harm, the plaintiffs must show that . . . they will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Harm is irreparable if it cannot be fully compensated by monetary damages. *Overstreet v. Lexington-Fayette Urban County Gov't.*, 305 F.3d 566, 578 (6th Cir. 2002).

The loss of the ability to collect a money judgment is not typically regarded as irreparable harm under Rule 65. The United States Supreme Court underscored this point in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999), in which it held that a district court has "no authority to issue a preliminary injunction preventing [the defendants] from disposing of their assets pending adjudication of [the plaintiffs'] contract claim for money damages." The plaintiff in *Grupo Mexicano* sought a preliminary injunction to prevent the defendant from transferring its rights in certain bonds to other parties on the grounds that defendant was: (1) at a high risk of insolvency; (2) in the process of dissipating its assets to other creditors; and (3) taking actions with its assets that would "frustrate any judgment" plaintiff could obtain. *Id.* at 312. Despite these risks—and the district court's determination that plaintiff was "almost certain" to succeed on the merits of its claim—the Supreme Court reversed the preliminary injunction, explaining that "a general creditor (one without a judgment) had no cognizable interest, either at law or in equity, in the property of his debtor, and therefore could not interfere with the debtor's use of that property." *Id.* at 319–20.

As several courts have held, "[t]here are limited exceptions to the Grupo Mexicano prohibition on asset-freeze injunctions issued to protect an anticipated judgment, such as where a plaintiff's complaint asserts an equitable claim to an asset with a "clear and close nexus to the assets sought to be enjoined." *Trustees of Sheet Metal Workers' Loc. Union No. 80 Pension Tr. Fund v. Winchester Land,* L.L.C., 722 F. Supp. 2d 826, 828 (E.D. Mich. 2010)

Post *Grupo Mexicano*, courts appear split on how to apply this exception when it comes to what constitutes an "equitable claim" under these circumstances. For example, a federal court in Michigan has held a plaintiff does not get the benefit of the equitable claim exception to *Grupo Mexicano* when "any equitable relief that [Plaintiff] may be entitled to obtain is contingent upon the success of its claim for money damages." *Barrette Outdoor Living, Inc. v. Michigan Resin Representatives*, LLC, No. 11-13335, 2014 WL 1516197, at *3 (E.D. Mich. Apr. 17, 2014) (citing other cases). Such is arguably the case here. On the other hand, the Sixth Circuit and this Court have held an asset-freeze injunction may be appropriate where "fraudulent conveyances" are involved. *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 628 (6th Cir. 2013).

Regardless of whether Plaintiff's claims are properly equitable, or contingent on monetary awards, Plaintiff has not shown a close and clear nexus to the assets sought to be enjoined. *Winchester Land*, 722 F. Supp. 2d at 828 (E.D. Mich. 2010). Plaintiff states that "the Motion seeks a freeze on the $990,815 transferred from Plaintiff to MDDI's account at Huntington National Bank and/or the equivalent amount that was withdrawn, converted, or transferred to another account or to third parties." (Doc. 8 at 4). Especially because Plaintiff otherwise states the money is likely to have been withdrawn already (*Id.* at 2), the Court finds this assertion does not pass muster as a "clear and close nexus to the assets to be enjoined." Moreover, as discussed, Plaintiff's current evidence of a fraudulent transfer is speculative. For these reasons, the Court finds an asset-freeze is not warranted at this stage.

Instead, a prohibition on the use, conversion, and disposition of Defendants' assets, and an order that Defendants provide an accounting of their assets, will maintain the status quo, while seeking to protect Plaintiff from irreparable harm and enabling Plaintiff to pursue evidence prior to the hearing on its motion for a preliminary injunction.

### C. Substantial Harm to Others or the Public

The Court finds injunctive relief would not impede others or the public. Ismail Shalash will not face harm except the possible, momentary restraint on assets he appears to have procured by fraud. The Court can see no harm to third parties whatsoever.

Further, it is in the public interest to enjoin Defendants from using, disposing of, or distributing Plaintiff's assets. After all, the temporary restraining order may deter others from orchestrating fraudulent schemes. *See Concheck*, 2010 WL 4117480 at *3. For the foregoing reasons, the factors, on balance, weigh in favor of issuing a TRO as tailored per above.

### IV. CONCLUSION

Accordingly, Plaintiff's motion for temporary restraining order (Doc. 3) is **GRANTED IN PART.** Specifically, the Court orders as follows:

1. Defendants Armand Brigante *a.k.a,* Ismail Shalash *a.k.a.* Mustafa Shalash and M.D.D.I. Inc. SHALL NOT individually, nor through others, use, convert, or dispose of Plaintiff's assets in their possession, custody, and control inclusive of funds in an amount up to $990,815; and

2. On or before October 13, 2021, Defendants SHALL provide to Plaintiff an accounting of ALL assets under their control, management, and/or possession, and include the names of the financial institutions, account numbers, account holders, the identity of the account signatories, and current balances

11

3. Forthwith, Plaintiff SHALL provide Defendants with a copy of this Order in any way practical. Additionally, the Clerk shall mail copies of this Order to Defendants at the addresses listed in the certificate of service to Plaintiff's motion for a temporary restraining order

This Temporary Restraining Order shall expire fourteen (14) days from the entry of this Order. The Court determines that Plaintiff need not post a bond currently.[3]

T**his civil action is set for a status conference by telephone on October 12, 2021 at 3:00 p.m.**, at which time the Court will address the necessity of a hearing on Plaintiff's motions for preliminary injunction. COUNSEL SHALL CALL: 1-888-684-8852; Access Code 8411435; Security Code 123456; and wait for the Court to join the conference.

**IT IS SO ORDERED**.

Date: 10/07/21

Timothy S. Black
United States District Judge

---

[3] *See* Fed. R. Civ. P. 65(c): " (The court may issue a … temporary restraining order only if the movant gives security <u>in an amount the court considers proper</u> …." (emphasis supplied). "The rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (citing *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978)).